IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

PATRICIA POTTER                )
                               )
                               )
        v.                     )        Case No. 3:05-0344
                               )
MICHAEL J. ASTRUE              )
Commissioner of Social Security[1]  )


To:  The Honorable Thomas A. Wiseman, Jr., Senior District Judge


## REPORT AND RECOMMENDATION


The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Secretary of Health and Human Services denying Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act").

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff could perform a light level of work and, therefore, other substantial gainful activity during the relevant time period is not supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the record (Docket Entry No. 5) should be granted.

---

[1]Michael J. Astrue is automatically substituted for his predecessor Jo Anne Barnhart as Commissioner of Social Security. Fed. R. Civ. P. 25(d)(1).

1

## I. INTRODUCTION

The plaintiff filed an application for DIB on May 8, 1997, alleging disability due to diabetes and fibromyalgia with a date of onset of January 1, 1992. (Tr. 55-57, 58.) The plaintiff's application for DIB was denied initially on June 10, 1997, and upon reconsideration on September 18, 1997. (Tr. 36-37) The plaintiff was found not disabled through June 30, 1994, her date last insured. (Tr. 34-37.)

A hearing was held before an Administrative Law Judge ("ALJ") on August 3, 1998. (Tr. 252, 353-85.) ALJ Garner issued an unfavorable decision dated October 2, 1998. (Tr. 252-57.) Upon the plaintiff's request for review (Tr. 261-62), the Appeals Council remanded the case to the ALJ on May 3, 2000 (Tr. 291-93), instructing the ALJ to further evaluate the plaintiff's subjective complaints, give further consideration to the plaintiff's residual functional capacity ("RFC"), evaluate the treating and non-examining source opinions and explain the weight given to each, and to obtain further evidence from a vocational expert ("VE"), if necessary. (Tr. 292-93.)

A second hearing was held before ALJ Garner on September 26, 2000. (Tr. 296, 386-424.) ALJ Garner issued an unfavorable decision on November 22, 2000. (Tr. 16-24, 506-14.) On February 6, 2002, the Appeals Council denied the plaintiff's request for review. (Tr. 11-12, 14-15, 521-24.)

The plaintiff filed suit in this Court for judicial review on April 5, 2002. (Tr. 528-30.) *See* Case No. 3:02-0342. Upon the defendant's motion to remand, the case was remanded by order entered August 6, 2002, under sentence six of 42 U.S.C. 405(g), because the agency file and hearing tape could not be located. (Tr. 535–37.) The case was reopened on October 7, 2002, and upon

2

defendant's motion, again remanded by order entered January 31, 2003, for further action. *See* Case No. 3:02-0342, Docket Entry Nos. 8-11 and 22-24.

On July 25, 2002, the Appeals Council vacated its prior decision of February 6, 2002, denying the request for review of the ALJ's November 22, 2000, decision. (Tr. 8-10, 531-32.) On April 9, 2003, the Appeals Council issued an order remanding the case to an ALJ for further proceedings in accordance with the Court's January 31, 2003, order. (Tr. 538-40.)

After a third hearing (Tr. 455-505), ALJ Cherry issued an unfavorable decision on June 24, 2004. (Tr. 444-54.) Upon the plaintiff's request for review, the Appeals Council upheld the decision of the ALJ on March 9, 2005, and the ALJ's decision became the final decision of the Commissioner. (Tr. 425-26, 441-42.)

## II. BACKGROUND[2]

The plaintiff was born on December 10, 1949, and was 42 years old as of January 1, 1992, her alleged onset date, and 44 years old as of June 30, 1994, her date last insured. (Tr. 55.) She completed the twelfth grade. (Tr 80.) Her past jobs included work as a cook, waitress, materials clerk, teacher/director at a daycare center, cook/dishwasher, and cashier. (Tr. 90.)

---

[2] Given the 12 year time period between the plaintiff's alleged onset date and the third hearing before an ALJ, the rendition of the plaintiff's medical treatment, set forth below, is lengthy but is included to show the consistency of her complaints and the variety of treatment not only prior to her onset date but also after her last date insured. However, the Court has not recounted the plaintiff's treatment for other physical problems, including vision problems, high blood pressure, and coronary artery disease (including hospitalization for coronary revascularization), because the plaintiff has not alleged that those conditions are disabling. In addition, the Court has not recounted in detail all of the issues and treatment related to the plaintiff's diabetes.

3

**A. Chronological Background: Procedural Developments and Medical Records**[3]

On February 4, 1992, the plaintiff presented to Dr. Cynthia G. Susskind, a neurologist, upon referral from Dr. Robert Brodows.[4] (Tr. 144.) The plaintiff reported pain in both upper extremities for six to seven months with intermittent shoulder pain, which was worse with use of her hands. The plaintiff also reported occasional leg weakness. Dr. Susskind performed an EMG and a nerve conduction study, which showed mild to moderate median nerve slowing across the left wrist and mild median nerve slowing on the right. *Id.* Dr. Susskind recommended that the plaintiff see an orthopedist and gave her a prescription for a left wrist splint and Thiamine (vitamin B1 supplement). (Tr. 144-45.)

On May 20, 1992, the plaintiff saw Dr. John P. Tetzeli, complaining of "diffuse pain, particularly . . . in the hands, arms, and lower extremities." (Tr. 135.) Dr. Tetzeli noted that the plaintiff was diagnosed with carpal tunnel syndrome a year before, that she had bilateral carpal tunnel release surgery three months prior to her appointment, but she experienced only a mild degree of improvement in pain following surgery. *Id.* She described her pain as severe, dull, and extending to her fingers and toes. *Id.* The plaintiff reported that she had to stop work as a clerk due to her foot pain. *Id.* She also had a seven-year history of type II diabetes mellitus. *Id.* The plaintiff reported intermittent visual blurriness and nocturia, which is excessive urination at night. *Id.* Dr. Tetzeli

---

[3]Every attempt to decipher the medical evidence of record was undertaken; however, some handwritten notations or poor copies made some of the records illegible. General information on the medical terms used and drugs prescribed to the plaintiff was obtained from Drugs.com and similar reputable online resources, unless otherwise indicated.

[4]Dr. Brodows examined the plaintiff in January 1992 and noted "possible neurologic disease," based on myalgias, jaw pain, knee, ankle, and toe pain, and he referred the plaintiff to Dr. Susskind. (Tr. 220.)

4

noted physical changes in the plaintiff's hands, including the inability to appose the fingers of both hands, inability to fully extend her fingers, and mild atrophic changes in both hands, along with mild tenderness and edema in the finger joints. (Tr. 134.) Dr. Tetzeli diagnosed diabetic peripheral neuropathy with secondary neuropathic arthropathy (problem with joints involving lack of nerve system input) involving the ankles. *Id.* He noted the possibility of a collagen vascular disease and stiff hand syndrome. Dr. Tetzeli recommended that the plaintiff begin insulin therapy to improve her hyperlipidemia and glycemic control. *Id.*

On June 29, 1992, the plaintiff returned to Dr. Susskind reporting much improvement in her arm pain following bilateral carpal tunnel surgery. (Tr. 143.) However, the plaintiff continued to experience pain and burning in both lower extremities, sensitivity in her feet, difficulty sleeping and "significant" pain upon standing and getting out of bed in the morning. *Id.* Dr. Susskind suspected symptoms of a peripheral neuropathy and noted hypersensitivity to a light touch. *Id.* Dr. Susskind noted a lack of improvement on the medication Pamelor and instead prescribed Imipramine (an antidepressant), a multivitamin, and Thiamine. *Id.*

The plaintiff returned to Dr. Susskind on July 8, 1992, for further evaluation of her "moderately severe" peripheral polyneuropathy, at which time she conducted an EMG and Nerve Conduction Study. (Tr. 130-40.) Dr. Susskind noted that the plaintiff had already experienced a significant improvement in her lower extremity pain after ten days of Imipramine. *Id.* Dr. Susskind also opined that the plaintiff exhibited "some psychologic overlay," due to her use of a walker, which Dr Susskind believed was unusual for a neuropathy patient, and "codependency issues" between the plaintiff and her husband. *Id.* However, Dr. Susskind predicted significant symptom improvement with medications.

5

The plaintiff returned to Dr. Tetzeli on July 17, 1992, and she reported that her foot pain was improving, although she used a walker most of the time. (Tr. 133.) Dr. Tetzeli noted that her pain was "lancinating [piercing or stabbing], persistent," and worse at night. *Id.* The plaintiff's glycemic control was "much improved," and she was reportedly following her diet. *Id.* Dr. Tetzeli noted that Dr. Susskind concurred in his diagnosis of peripheral neuropathy due to diabetes, and Dr. Tetzeli also noted a psychological overlay and slow improvement of symptoms. *Id.* Dr. Tetzeli continued the plaintiff's diabetes medications as well as Imipramine and Thiamine for peripheral neuropathy. *Id.*

The plaintiff returned to Dr. Tetzeli for follow-up on August 25, 1992. (Tr. 132.) Dr. Tetzeli noted decreased range of motion and tenderness in both shoulders, but improved glycemic control. *Id.* Dr. Tetzeli also referred to the plaintiff's treatment with Dr. Susskind for her diabetic polyneuropathy "of a moderate to severe degree" with psychological overlay. *Id.* Medications included Imipramine, Thiamine, and Tegretol, a drug used to treat nerve pain and bipolar disorder. Id.

Dr. Susskind examined the plaintiff on September 2, 1992, and reported that the plaintiff exhibited "significant pain improvement" on a regimen of Imipramine, Tegretol, Axsain cream, and vitamins. (Tr. 137.) Dr. Susskind recommended increasing the dosage of Imipramine and tapering off Tegretol. *Id.* She noted that the plaintiff was "doing much better overall," and anticipated being able to get the plaintiff's neuropathic pain "under total control." *Id.*

On October 28, 1992, Dr. Susskind wrote to Dr. M. Porter Meadors, a rheumatologist, requesting that he evaluate the plaintiff for "any kind of an inflammatory condition." (Tr. 136.)

Dr. Susskind stated that while the plaintiff was improved on her current medications, she continued to note pain and aching in her joints, neck muscles, and spine. *Id.*

Dr. Meadors examined the plaintiff on October 29, 1992. (Tr. 146.) Dr. Meadors noted that he had previously evaluated the plaintiff in September 1991, and at that time, there were indications of diabetic peripheral neuropathy, hints of inflammatory arthritis and "quite a bit" of soft tissue rheumatism. *Id.* The medication Voltaren did little to improve her symptoms, and she was last seen in January 1992. Dr. Meadors noted that the plaintiff continued to have persistent pain in her hands following carpal tunnel release surgery, as well as neck stiffness and difficulty sleeping. *Id.* However, the plaintiff reported "excellent improvement" in some of her symptoms on Imipramine. *Id.* Following physical evaluation and testing, Dr. Meadors concluded that "the majority of [the plaintiff]'s complaints [were] neuropathic in origin." *Id.* He mentioned Diabetic Stiff Hand Syndrome, the symptoms of which mimic inflammatory arthritis. *Id.* He prescribed Ansaid and Flexeril, and recommended follow up in a month. (Tr. 147.)

On November 19, 1992, a MRI of the cervical spine revealed minimal spondylitic changes, but no significant disc protrusion. (Tr.142.) On November 20, 1992, the plaintiff returned to Dr. Susskind complaining of "a significant amount of pain involving her neck and shoulder muscles." (Tr. 143.) Dr. Susskind noted that the MRI did not show any significant disc protrusion. *Id.* Dr. Susskind suspected myofascial pain and increased the plaintiff's dosage of Imipramine, recommending a follow up in "several months." *Id.*

According to a September 1996, hospital admission record, the plaintiff did not see an internal medicine doctor between 1993 and 1996, but she was able to obtain refills of her insulin from her gynecologist. (Tr. 161, 164.) During the period between 1993 and 1996, the plaintiff

7

managed her own dosages of insulin, ran out of test strips, and eventually lost track of her blood sugar levels. She began losing weight,[5] feeling tired, and experiencing excessive urination. Her condition worsened and she eventually went to the St. Thomas Hospital emergency room on September 23, 1996. *Id*. Dr. Gary McDonald oversaw the plaintiff's care, and she was hospitalized for several days in an effort to get her blood sugar and related symptoms under control. (Tr. 165.) Her diagnosis included diabetic ketoacidosis, chronic arthritic process of hands, "[p]robable fibromyalgia," pseudohyponatremia, and hypokalemia. (Tr. 164.)

After her immediate problems were resolved, the plaintiff requested reassessment of the pre-existing and previously unexplained claw-like changes in her hands. The plaintiff's hands had a "hide-bound" appearance and she was unable to straighten them. *Id*. The results of an EMG were essentially normal (Tr. 179-80), and an x-ray showed no evidence of neuropathy, recurrence of carpal tunnel syndrome, or an intrinsic muscle disease (Tr. 176-77).

The plaintiff returned for a follow-up visit with Dr. McDonald on October 21, 1996. (Tr. 156-59.) The plaintiff's blood sugar was normalizing, but she was still reporting diffuse stiffness, particularly in her right upper extremity. The plaintiff's right hand had a "definite claw-like shape," with the left hand "similar but perhaps just slightly less symptomatic." (Tr. 156, 158.) The plaintiff had difficulty squeezing Dr. McDonald's fingers tightly, had dry skin, and exhibited very good vibration sense in all four extremities. (Tr. 158.) Dr. McDonald increased the plaintiff's dosage of insulin. (Tr. 158-59.)

---

[5]The plaintiff weighed 115 pounds on September 23, 1996, and reported that her usual weight for the past three years was 134 pounds. The plaintiff is 5'2" tall. (Tr. 162.)

On November 6, 1996, the plaintiff presented to Dr. J. Thomas John, a rheumatologist, for a consultation for "questionable arthritis, fibromyalgia, and diabetic stiff hand syndrome." (Tr. 214-15.) Dr. John noted her recent x-rays showing periartciular osteoporosis, as well as hand, foot, shoulder, and generalized pain, which were worse in the morning but "pretty much . . . all the time." (Tr. 214.) He noted little swelling aside from the MCP joint and decreased range of motion of the wrist. The plaintiff exhibited dry eyes and mouth, occasional short-windedness, and had some swelling in her feet. *Id.* She had a poor range of motion in her shoulders, decreased flexion in her wrist, and "mild to moderate" claw hands with decreased flexion and extension of the hands. *Id.* The plaintiff exhibited diffuse tenderness at almost all points, and not just the "fibromyalgia tender points," rendering the "physical examination for fibro . . . quite inconclusive." (Tr. 215.) Dr John diagnosed early age onset diabetes with diabetic stiff hand syndrome, as well as a "[p]ossibility/probability of fibromyalgia," and "some type of mild inflammatory arthritis." *Id.* He prescribed Plaquenil and referred the plaintiff to a hand occupational therapist and physical therapist. *Id.*

The plaintiff returned to Dr. McDonald on December 2, 1996. (Tr. 154-55.) Her blood sugar was "much better." (Tr. 154.) Dr. McDonald adjusted her diabetes medications, noted diagnoses of synovitis, arthritis, and diabetic hand syndrome for which she was being treated with Plaquenil. (Tr. 154-55.)

Dr. McDonald examined the plaintiff again on December 23, 1996. (Tr. 153.) At that time, the plaintiff reported experiencing dysesthesias, or unpleasant and abnormal responses to stimuli, in her feet for the past three months. She reported that the Plaquenil prescribed by Dr. John was helping with the tightness in her joints. *Id.* Dr. McDonald observed that the "[j]oints at the wrist,

the hands and fingers seem[ed] a bit stiff." *Id.* Dr. McDonald again adjusted the plaintiff's diabetes medication to help normalize her blood sugar levels, noted "[d]iffuse arthralgias with muscle pain," and prescribed Elavil, an antidepressant. *Id.*

The plaintiff returned to Dr. McDonald on February 10, 1997, continuing to experience dysesthesias down her legs, describing the feeling as "like shingles" or a sunburn. (Tr. 152.) She reported taking up to six Ultram a day to "blunt the discomfort." *Id.* She was also experiencing a poor appetite, difficulty sleeping, and pain in the medial aspect of the left elbow radiating down to the left hand when she lifted her arm over her head. *Id.* Dr. McDonald increased her dosage of Elavil to help her sleep and improve her appetite, but he warned her to be cautious taking Ultram due to potential drug interaction causing seizures. *Id.*

The plaintiff returned to Dr. John on February 26, 1997, reporting improvement on Plaquenil. (Tr. 212.) Dr. John wrote to Dr. McDonald describing the plaintiff's current situation, noting that she was experiencing less swelling of her MCP joints, but was having epigastric pain as well as some "bizarre hypersensitivity in her thighs" that radiated down her legs to her feet. *Id.* Dr. John suspected meralgia paresthetica, and noted that if it got much worse, a neurological evaluation might be indicated. *Id.* For the first time in the medical records, Dr. John appeared to have definitely diagnosed the plaintiff with fibromyalgia because he reported that she had not yet seen "the therapist for fibromyalgia" and he urged her "to get to the therapist if she can for dealing with the fibro[myalgia]."[6] *Id.*

_____

[6] The plaintiff contends that Dr. John diagnosed her with fibromyalgia on February 6, 1996, *see* Docket Entry No. 6 at 6-7, and 18, but it is not clear to the Court to what February 6, 1996, medical record the plaintiff refers. The plaintiff refers to her own testimony at the August 3, 1998, and September 26, 2000, hearings and to an office visit on February 6, 1996, but there are no medical records of a February 6, 1996, office visit in the administrative record.

The plaintiff returned to Dr. McDonald on April 22, 1997, describing her as a patient with "fibromyalgia and a diabetic hand syndrome," which had improved on Plaquenil, and "noting that [o]verall she seemed tremendously better." (Tr. 148.) She reported less swelling in her hands, signing up for a fibromyalgia newsletter, and seeing a therapist. *Id.* Her blood sugar levels were also much better. Her medications included Ultram, Elavil, Plaquenil, Calcium Carbonate, Estratest, and Humulin. *Id.* Dr. McDonald observed on examination that "her hands still have a very claw-like deformity and she does not have the ability to fully squeeze my fingers." *Id.* He noted that her hands were "quite stiff overall," and that she did not have enough movement to allow for typing or even holding a telephone.[7] Dr. McDonald opined that "she is still no where near being able to work in terms of her hand function and I am afraid given her degree of trouble she may not be able to do so. We will see how therapy works for her." *Id.*

Dr. Frederic E. Cowden, a non-examining DDS consultant, completed an RFC form on June 9, 1997. (Tr. 189-96.) Dr. Cowden listed the plaintiff's primary diagnosis as "diabetes mellitus," and her secondary diagnosis as "diabetic neuropathy - s/p cts surgery." (Tr. 189.) He indicated that the plaintiff could lift/carry up to twenty pounds occasionally and up to ten pounds frequently. (Tr. 190.) Dr. Cowden opined that she could stand/walk and sit about six hours in an eight hour day, and that pushing and pulling was unlimited. *Id.* His explanatory notes are largely illegible, except for a notation that on "6/92 - Hands much improved," and "EMG minimal abnormalities." (Tr. 191.) He indicated that no postural limitations were established. *Id.* He noted

---

[7] Dr. McDonald specifically reported that the plaintiff "certainly does have enough movement to allow her to type or even to properly hold a telephone." (Tr. 148.) From the context of this statement, the Court infers that a typographical error caused the word "not" to be omitted, whereas the sentence should actually read that the plaintiff "does not have enough movement to allow her to type or even to properly hold a telephone."

11

no manipulative, visual, communicative, or environmental limitations. (Tr. 192-93.)  Dr. Cowden indicated that there were no treating or examining source statements in the plaintiff's file. (Tr. 195.)

Vocational Specialist Linda Smith, a DDS consultant, completed a "Comments" Form on June 9, 1997, indicating that the plaintiff had an RFC for light work and could return to her past relevant work as a cashier-checker, a job classified as light and unskilled. (Tr. 112.)

On June 23, 1997, the plaintiff called Dr. John's office reporting that her "medicine stopped working" and that her pain had returned. (Tr. 213.)  Dr. John recommended physical therapy. *Id.* When the plaintiff was seen by Dr. John on August 13, 1997, she reported "muscle pain all over" and that she was "unable to stand for long periods of time." (Tr. 211.)  Dr. John noted that the plaintiff initially experienced improvement on Plaquenil, but after some of her symptoms returned, she stopped taking the Plaquenil. *Id.*  He noted "she has yet to see a physical therapist,"[8] and suggested that she go back on her Plaquenil. *Id*  He also noted "rather impressively exquisite tender points." *Id.*

The plaintiff was seen by Dr. McDonald on July 16, 1997, for follow-up for her fibromyalgia and other problems. (Tr. 243.)  He noted that the plaintiff was "under a great deal of stress" due to the denial of disability benefits in light of the fact that she could not "use her hands to do any sort of typing or other activities" because of her claw hand syndrome and accompanying diminished grip strength and mobility of the hands. *Id.*  Dr. McDonald reported that the plaintiff was seeing a reflexologist for her fibromyalgia and had stopped taking her Plaquenil, Elavil, and Ultram due to unpleasant side effects such as itching and tiredness. *Id.*  She reported doing better in terms of her

---

[8]However, Dr. McDonald had noted that the plaintiff was "seeing a therapist" on April 22, 1997.  (Tr. 148.)

fibromyalgia symptoms although she still experienced fatigue and diffuse aching. *Id.* Dr McDonald adjusted her diabetic medications and suggested an antidepressant, which the plaintiff refused. *Id.* He noted her diabetic hand syndrome, stated that he believed that the plaintiff was "truly disabled on the basis of her hand problems," and cited both subjective complaints and "visible problems" as evidenced by a "markedly abnormal series of x-rays." (Tr. 244.)

On September 19, 1997, Dr. Reeta Misra, a non-examining DDS consultant, completed an RFC Assessment, listing her primary diagnosis as fibromyalgia and her secondary diagnosis as carpal tunnel syndrome. (Tr. 197-204.) Dr. Misra essentially duplicated the opinions and limitations set forth by Dr. Cowden in his June 9, 1997, assessment. (Tr. 198-203.)

The plaintiff returned to Dr. McDonald on September 26, 1997, for follow-up on her "diabetes and other problems." (Tr. 241-42.) Dr. McDonald expressed his surprise at the plaintiff's denial for Social Security benefits, citing the degree of trouble that the plaintiff experienced with the functionality of both hands "which would make it very difficult for her to do any sort of receptionist work or other physical work." (Tr. 241.) Dr. McDonald noted that the plaintiff had stopped taking Plaquenil out of frustration because her fibromyalgia was not improving. *Id.* She explained that she had been too busy with family problems to go to physical therapy, and Dr. John had refused to see her again until she pursued physical therapy. *Id.* Dr. McDonald noted some improvement in her dysesthesias of the feet, but indicated that she had right-sided temporomandibular joint pain that caused headaches. *Id.* He encouraged her to pursue physical therapy as well as her disability claim, on the basis of her claw hand syndrome which he opined was permanent and not expected to improve, as well as her other medical problems. (Tr. 242.)

13

The plaintiff returned again for follow-up with Dr. McDonald on November 21, 1997. (Tr. 239-40.) The plaintiff had gained a notable amount of weight - from 127 to 158 pounds - and was experiencing trouble with left jaw pain. (Tr. 239.) She was having some trouble controlling her blood sugar, and there was no change in her diabetic claw hand. *Id.* Dr. McDonald observed a goiter and ordered a thyroid function test to rule this out as a cause for her "sugar problems." (Tr. 240.) Dr. McDonald referred the plaintiff to Dr. LaGrone for a second opinion, and he noted that Dr. John had withdrawn from her care when the plaintiff was not able to participate in physical therapy. *Id.*

Dr. McDonald saw the plaintiff again on January 16, 1998. (Tr. 238.) The plaintiff reported improved blood sugar levels, but more muscle aches and pains. *Id.* Dr. McDonald suggested that the plaintiff "continue to pursue disability coverage" because of her claw hand syndrome and recommended that she focus on getting a good night's sleep to help with her fibromyalgia. *Id.*

The plaintiff returned to Dr. McDonald on March 27, 1998, but the first page of his write-up of this visit appears to be missing from the record. (Tr. 237.) He recommended that the plaintiff work on diet and exercise to better control her diabetes, recommended that she treat right ankle pain with ice and Tylenol, and that she restart Plaquenil for her fibromyalgia. *Id.*

On May 25, 1998, Dr. Tetzeli completed a Medical Assessment to Do Work-Related Activities. (Tr. 206-210.) Dr. Tetzeli treated the plaintiff in 1992, *see supra*, at 4-5, and indicated that the date that he last saw the plaintiff was August 25, 1992. (Tr. 206.) He opined that at the time he was treating the plaintiff, she could sit for one hour at a time and stand/walk less than one hour at one time in an eight hour day. *Id.* He indicated that she could sit for five hours total and stand/walk for one hour total. *Id.* Dr. Tetzeli noted that the plaintiff's conditions of moderate to severe diabetic peripheral neuropathy and carpal tunnel syndrome supported this assessment. *Id.*

14

He further noted that the plaintiff could not use her hands to repeatedly grasp, push/pull, or perform fine manipulation. *Id.* Similarly, she could not use her feet for repetitive movements, such as operating foot controls. (Tr. 207.) Dr. Tetzeli indicated that the plaintiff could occasionally lift zero to four pounds, rarely lift five to nine pounds, and never lift over ten pounds. *Id.* Dr. Tetzeli assigned the same weight limits on carrying. (Tr. 208.) He opined that she could rarely bend, squat, and reach above shoulder level, and never climb or crawl. *Id.* Dr. Tetzeli assigned a total restriction on activities involving unprotected heights, being around moving machinery, exposure to dust, fumes, and gases, and using vibrating tools. (Tr. 209.) He assigned moderate restrictions on exposure to marked changes in temperature and humidity and driving automotive equipment.

Dr. Tetzeli indicated that the plaintiff was additionally limited in activities by pain, and that her pain was severe, noting "pain is significantly increased w[ith] activity." *Id.* Dr. Tetzeli provided a page-long explanatory note, stating that at the time he treated the plaintiff in 1992, "she was in moderate to severe pain due to diabetic neuropathy." (Tr. 210.) He pointed out that she was using a walker and experienced fatigue with "any type" of activity. *Id.* The plaintiff underwent unsuccessful carpal tunnel surgery and still experienced pain and loss of strength in her hands and wrists. *Id.* He opined that in 1992, "she was not able to work on any job because of these limitations." *Id.* Dr. Tetzeli went on to remark that he was aware that the plaintiff was subsequently diagnosed with fibromyalgia, and he opined that "[h]er symptoms at the time that [he] saw her in 1992 were compatible w[ith] that diagnosis." *Id.*

On July 26, 1998, Dr. McDonald completed a Medical Assessment to Do Work-Related Activities. (Tr. 230-34.) Dr. McDonald opined that the plaintiff could sit one hour at a time in an eight hour day, and stand/walk less than one hour at a time. (Tr. 230.) He indicated that the plaintiff

15

could sit up to five hours total and stand/walk only one hour total. *Id.* Dr. McDonald listed diabetic hand syndrome, fibromyalgia, and carpal tunnel syndrome as the medical findings supporting these conclusions. *Id.* He ruled out use of the hands for repetitive actions such as grasping, pushing and pulling, and fine manipulation. *Id.* He also ruled out the use of her feet in operating foot controls. (Tr. 231.) Dr. McDonald opined that the plaintiff could lift zero to four pounds occasionally, five to nine pounds rarely, and never more than ten pounds. *Id.* He assigned the same limitations to the amounts of weight that she was able to carry. (Tr. 232.)

Dr. McDonald indicated that the plaintiff could rarely bend, squat, and reach above shoulder level, and never crawl or climb. *Id.* He totally ruled out activities involving unprotected heights, being around moving machinery, exposure to dust, fumes, and gases, and using vibrating tools, while indicating that she could undergo moderate exposure to changes in temperature and humidity, and would have a severe restriction on driving automotive equipment. (Tr. 233.) He indicated that the plaintiff was additionally limited in activities by pain, and that pain presented a severe restriction on the plaintiff's ability to function, noting that "[p]ain significantly increases with activity." *Id.* Dr. McDonald's explanatory, narrative statement read:

> Since I began seeing [the plaintiff] in September of 1996, she has suffered from diffuse aches in the muscles all around her upper and lower back, neck, and her upper and lower arms. She has chronic problems with dysesthesias particularly down her legs. Her symptoms are consistent with a diagnosis of fibromyalgia. Based upon the history I took of [the plaintiff] and my review of her medical records, she has had these same or similar symptoms since 1991 when she was seen by Dr. Porter Meadors. Her hands have a claw-like deformity and are quite stiff as a result of diabetic hand syndrome. She does not have enough movement to write well, type, or even hold a phone properly. I understand that she has had very limited movement with her hands as a result of the diabetic hand syndrome since she saw Dr. Cynthia Susskind in 1992. I know of no job she could perform with these limitations. If she has had these same limitations since 1992, I do not believe she would have been able to work from 1992 until I began seeing her in September of 199[6].

16

(Tr. 234.)

The plaintiff returned to Dr. McDonald on August 14, 1998, for "diabetes follow up" (Tr. 319-20) and again on November 16, 1998. (Tr. 318.) She reported trouble exercising due to diabetic complications including neuropathy and claw-hand syndrome, adding that her energy level was "chronically poor." Dr. McDonald noted the claw-hand deformity as well as "markedly diminished functional ability."

Dr. McDonald saw the plaintiff again on February 2, 1999, and noted concern over her recent dramatic weight gain. (Tr. 317.) The plaintiff complained of fatigue and had an upper respiratory infection. Her diabetes was poorly controlled, and Dr. McDonald referred her to a diabetologist. *Id.*

The plaintiff returned to Dr. McDonald on March 8, 1999, complaining of leg swelling. (Tr. 315-16.) He noted that her fibromyalgia symptoms were "doing better," although she was limited in her exercise ability and having problems with weight gain. (Tr. 315.)

Dr. McDonald again saw the plaintiff on February 21, 2000. (Tr. 314.) Her diabetes continued to be poorly controlled, and her diabetic claw hand syndrome continued to be debilitating to the point that the plaintiff had trouble doing "simpl[e] activities such as driving." *Id.* He noted that her fibromyalgia was stable on Plaquenil. *Id.*

On February 26, 2001, the plaintiff saw Dr. McDonald for a follow up on her elevated blood pressure and diabetes. (Tr. 593.) The plaintiff quit taking her medication because she "thought it was making her feel poorly." *Id.* Her diabetic claw hand problem was "stable," but she had trouble in her left palm with trying to grip, as well as muscle spasm. *Id.* Dr. McDonald added Teveten for her hypertension and recommended that she continue taking Avandia. *Id.* Dr. McDonald followed up this visit with a letter to the plaintiff encouraging her to continue to take her medications. (Tr. 592.)

17

On April 9, 2001, Dr. McDonald again wrote to the plaintiff to let her know that her blood sugar levels were not as well-controlled as they should be, and again recommended that she see a diabetic specialist. (Tr. 588.) Dr. McDonald wrote again on November 1, 2001, suggesting that the plaintiff either go on new drugs, Humalog with Lantus, or have an insulin pump implanted to better control her blood sugar levels. (Tr. 584.)

The plaintiff presented to Dr. McDonald on June 28, 2002, for a follow-up visit. (Tr. 578.) Dr. McDonald noted that the plaintiff's diabetic claw hand syndrome "has left her functionally disabled," and he added, "I feel she deserves [disability benefits] since she can't really use her hands for any sustained activity." *Id.*

The plaintiff returned to Dr. McDonald on June 20, 2003, at which time she reported that her diabetic claw hand syndrome was worsening and she was "having difficulty picking up and manipulating objects." (Tr. 574.) Additionally, the neuropathic pain in her feet was worsening. She continued to experience rosacea, right hip pain, and right ear congestion. Dr. McDonald increased her hypertension medication, noted that her diabetic claw hand syndrome was chronic and worsening and had no treatment, and that he "suggested she go on disability." *Id.*

Dr. McDonald completed a Medical Source Statement of Ability to Do Work-Related Activities ("Medical Source Statement") on June 22, 2003. (Tr. 570-73.) He opined that she could lift/carry less than ten pounds both occasionally and frequently due to her diabetic claw-hand syndrome. (Tr. 570.) He indicated that she could stand/walk less than two hours in an eight hour workday due to her diabetic sensory neuropathy of her feet. *Id.* He opined that the plaintiff could sit less than six hours in an eight hour day due to the neuropathy in her feet. *Id.* He limited pushing and pulling in both upper and lower extremities, due to the diabetic claw hand syndrome and the sensory

18

neuropathy of both feet. (Tr. 571.) Dr. McDonald limited all postural activities to "never," including climbing, balancing, kneeling, crouching, crawling, and stooping. *Id.* He indicated that reaching, handing, fingering, and feeling, were all limited to "occasionally," with the last three being "very restricted." (Tr. 572.) He indicated that she experienced diabetic eye problems, limiting her ability to see. *Id.* All environmental limitations, including temperature extremes, dust, vibration, humidity/wetness, hazards, and fumes were limited, with only noise being marked as unlimited. (Tr. 573.)

On September 2, 2003, Dr. Charles Hancock, a non-examining orthopedic consultant, completed a set of interrogatories at the request of the ALJ. (Tr. 602-05.) Dr. Hancock was instructed to focus on the period from January 1, 1992, to the present. (Tr. 603.) Dr. Hancock indicated that the plaintiff suffered from the severe physical impairments of diabetes with polyneuropathy and claw hands with "decreased ability to use," as well as fibromyalgia, but noted that the fibromyalgia diagnosis was "not well made by ACR [American College of Rheumatology] criteria." *Id.* He opined that these impairments did not meet or equal a listing. (Tr. 603-04.) Dr. Hancock noted that the plaintiff generally followed medical advice in the course of treatment, although he also noted a reluctance to see and follow up with an occupational therapist. (Tr. 605.)

Dr. Hancock also completed a Medical Source Statement on September 2, 2003. (Tr. 606-09.) He opined that the plaintiff could lift/carry less than ten pounds both frequently and occasionally, and that she could stand/walk at least two hours in an eight hour day. (Tr. 606.) He indicated that the plaintiff could sit about six hours in an eight hour day, and that pushing and pulling were limited to occasionally in both the upper and lower extremities. (Tr. 607.) Dr. Hancock noted that the plaintiff's ability to lift/carry was limited due to the decreased ability to use her hands, that she had painful feet

19

secondary to neuropathy that affected her ability to stand/walk, and that her ability to push and pull were limited in the upper and lower extremities due to the same conditions. *Id.*

Dr. Hancock opined that the plaintiff could occasionally climb ramps/stairs, but never climb a ladder/rope/scaffold. *Id.* He limited balancing and kneeling to frequently, and crouching, crawling, and stooping to occasionally. *Id.* He indicated that muscle pain would limit kneeling, crouching, crawling, and stooping. *Id.* Dr. Hancock opined that the plaintiff was unlimited in reaching, but that handling, fingering, and feeling were limited to occasionally. (Tr. 608.) Dr. Hancock noted that there were no visual limitations. *Id.* He limited the plaintiff's exposure to temperature extremes and vibration due to arthritis and carpal tunnel symptoms. (Tr. 609.)

Dr. Albert Gomez, an internist, performed a consultative examination on October 17, 2003, (Tr. 612-16) at which time he found that the plaintiff had moderate tenosynovitis bilaterally in her wrists with decreased range of motion. (Tr. 614.) She could not extend the fingers of both hands, and made "poor" fists and had decreased grip strength. *Id.* She had moderate edema and moderate tenderness along the finger joints in both hands. *Id.* The plaintiff exhibited decreased flexion in both hips, along with moderate tenderness to palpation in both hip joints. She also exhibited decreased flexion in both knees. *Id.* Dr. Gomez noted decreased sensory innervation in both feet, and that the plaintiff could not squat due to back and knee pain. (Tr. 615.) Dr. Gomez concluded that the plaintiff could occasionally lift twenty pounds in an eight-hour day and stand or sit at least six hours in an eight-hour day with normal breaks. *Id.* However, he noted that "she could not be fully assessed without more information concerning the current status of her heart," and he recommended a review of her last cardiac work up. *Id.*

20

Dr. Gomez also completed a Medical Source Statement dated October 17, 2003. (Tr. 617-20.) He indicated that the plaintiff could lift/carry up to twenty pounds occasionally and ten pounds frequently. (Tr. 617.) He opined that standing and walking were affected, and that the plaintiff could do so with normal breaks for about six hours in an eight-hour day. *Id.* He indicated that sitting and pushing and/or pulling were affected, but he failed to indicate the extent of these limitations. (Tr. 618.) All postural limitations, including climbing, balancing, stooping, and the like, were limited to "occasionally" (up to one third of an eight-hour day). *Id.* Reaching was unlimited, but handling, fingering, and feeling were all limited, although Dr. Gomez failed to indicate the degree of limitation. (Tr. 619.) Seeing, hearing, and speaking were unlimited. *Id.* Dr. Gomez indicated that the plaintiff was limited in exposure to temperature extremes and hazards such as machinery and heights, but unlimited as to factors such as noise, dust, vibration, and the like. (Tr. 620.) Again, he handwrote an addendum to his evaluation: "Can't fully evaluate without more information concerning the current status of her heart." *Id.*

On November 15, 2003, the ALJ asked Dr. Hancock to provide a Medical Source Statement, focusing on the plaintiff's condition prior to her date last insured of June 30, 1994. (Tr. 678.) The ALJ had initially asked Dr. Hancock to provide answers to his interrogatories assuming that the plaintiff's current condition was at issue and failing to take into account her date last insured of June 30, 1994. *Id.* The ALJ later wrote to Dr. Hancock, asking him to revise his assessment to include only the plaintiff's condition "on June 30, 1994." *Id.* Dr. Hancock reviewed the evidence from this time period, and he ultimately concluded that the evidence was "insufficient to accurately assess [the] degree of impairment at [the date last insured]." (Tr. 679-80.) However, he stated that if he were to consider her condition "in reverse," one could reasonably assume that the plaintiff had

21

a "significant impairment" as of her date last insured, and concluded that a "light RFC would probably have been reasonable," although he reiterated his reservations and the conjectural nature of his conclusions. *Id.*

Dr. Hancock also prepared a Medical Source Statement based on his conclusion that the plaintiff could have probably performed light work as of June 30, 1994. (Tr. 680-84.) He opined that she could have lifted/carried twenty pounds occasionally and ten pounds frequently, stood/walked about six hours in an eight hour day, and that she would have been frequently limited in pushing and/or pulling in both upper extremities. (Tr. 681-82.) He noted that she would have been "unable to oppose fingers," and "unable to fully extend fingers at MCP joints." (Tr. 682.) He also noted that she could have frequently climbed ramps/stairs, but never climbed ladders/ropes/scaffolds. *Id.* She could have performed other postures frequently, including balancing, kneeling, crouching, crawling, and stooping. *Id.* He opined that she would have had frequent limitations in handling and occasional limitations in fingering, but no visual/communicative limitations. (Tr. 683.) There were no environmental limitations. (Tr. 684.)

### B. Hearing Testimony: The Plaintiff and a Vocational Expert

The plaintiff's third hearing in this case was held on March 15, 2004, before ALJ Mack Cherry. (Tr. 455.) The plaintiff was represented by an attorney, and the plaintiff and a Vocational Expert ("VE") testified at the hearing. *Id.*

The plaintiff testified that she became unable to work in January 1992. (Tr. 459.) She explained that her job at that time was as a cashier at Wal-Mart, and involved straightening and restocking items at the end of each day. (Tr. 460.) She testified that it became very difficult for her

to walk, stand, and be at her cash register because her knees and ankles became stiff. She also began experiencing sharp pains in her hands, making it difficult for her to pick up objects. (Tr. 460-61.) The plaintiff explained that this condition struck her "overnight," and that one day, she suddenly could not do her job anymore. (Tr. 461.) She experienced radiating pain in her arms, joints, and hands. *Id.* She became unable to do things that she had normally done, such as yard work and mowing the grass. *Id.*

The plaintiff demonstrated at the hearing that the range of motion in her hands was extremely limited. (Tr. 462.) She testified that her doctors called her condition diabetic claw hand or stiff hand, but that she does not really believe that diagnosis, because her hand condition began when all of her other pain started. *Id.* The plaintiff also testified that her hands are stiff and weak and that she cannot grip or grasp things, including drinking glasses. *Id.* Overuse of her hands caused sharp and shooting pains around her joints and into her muscles. *Id.* She testified that this pain kept her from sleeping, and that she experienced the same type of pain in her feet if she stood or walked too much. *Id.* The plaintiff explained that she had learned to live with her limitations and to know when she needed to rest to avoid pain. (Tr. 463.)

The plaintiff testified that she could write one full page now without severe pain, but that in 1992, that would have been "impossible." *Id.* She testified that in 1992, merely holding a pencil was difficult and that she could not hold a pencil tightly enough to write well. (Tr. 464.) She had difficulties operating a cash register and handing money, and she frequently dropped things. *Id.* The plaintiff testified that her knees and ankles hurt when she stood, and she described her pain as similar to the pain that comes when "it feels like [a joint] needs to pop, but it won't . . . . that real sharp pain." *Id.* The plaintiff testified that in 1992, she also had difficulty walking because her feet would not flex

23

without pain. (Tr. 465.) She also experienced extreme sensitivity in the bottoms of her feet and could not walk without shoes on. *Id.* During 1992, the plaintiff experienced such difficulty with walking that she used a walker and a wheelchair for a time. *Id.* The plaintiff had an especially hard time walking on uneven surfaces because they aggravated her muscle pain and caused falls. (Tr. 466.)

The plaintiff also explained that in 1992, she experienced shoulder pain when she tried to reach for things, and that she had a limited ability to raise her arms and reach. *Id.* The plaintiff further testified that in 1992, she had pain "all over" her body. (Tr. 467.) She described her pain as aching, sharp, and sometimes flu-like with an "all over ache." *Id.* She testified that after having carpal tunnel surgery on both hands, some of the pain in her shoulders and the swelling in her arms and hands were alleviated. (Tr. 468.) The plaintiff completed physical therapy and testified that her hands felt somewhat better during therapy, but as soon as she got in the car to go home, her condition reverted to what it was before the physical therapy. (Tr. 469.) She testified that after six or eight weeks of physical therapy she "never got any better." *Id.* At that time, she also began experiencing difficulty walking.

The plaintiff testified that Dr. Tetzeli put her on anti-depressants, which "work the opposite" on her. (Tr. 470.) She reported that she became upset with Dr. Tetzeli and stopped taking that medication. *Id.* She then began to see Dr. Susskind, who also wanted the plaintiff to take antidepressants, and the plaintiff testified that her doctors began to "fight with each other" over her medications. *Id.* She voiced her frustrations with seeing "like five different doctors," each of whom wanted her to take a different type of medication. *Id.* She testified that she just "had to quit." *Id.* The plaintiff related that Dr. Susskind had her on "so many anti-depressants" that she began to experience nightmares, was having trouble sleeping, was crying "all the time," "still in pain," and

24

confused about her medical condition. (Tr. 471.)  The plaintiff stopped seeing all of the specialists after 1992 and returned to a "regular" doctor, Dr. Daugherty, whom she saw in 1993. *Id.*

The plaintiff testified that Dr. Daugherty moved away in 1993, and between 1993 and 1996, she did not have a doctor. (Tr. 473.)  The plaintiff explained that she had "such a bad time with all the others" that she did not want to become involved with doctors again.  However, she testified that her symptoms during 1994 and 1995 were "the same." *Id.*  During that time period, the plaintiff admits that she did not take good care of herself, she lost weight, and she eventually went into ketosis.[9] *Id.*

The plaintiff related that Dr. John and Dr. McDonald prescribed Plaquenil, a medication normally used to treat malaria, which had been found to be effective in treating fibromyalgia, and that she did get better on this medication. *Id.*  She took Plaquenil until 2003, when she began experiencing bleeding in her eyes, which Dr. McDonald opined might have been caused by the Plaquenil, so she stopped taking the medication and underwent surgery to repair her retina.  *Id.*

The plaintiff testified that her symptoms improved on Plaquenil, but that since she stopped taking the medication, "all the pain [came] back," including "[p]ain that [she] had forgotten about." (Tr. 476.)  She testified that her lower back pain returned and made it difficult to bend over or walk "too much," and that she has had to learn again to deal with the pain and block it out and know how far she can push herself. *Id.*  She described feeling "lazy," as if she just did not want to do anything. *Id.*

---

[9] Even though the March 15, 2004, hearing transcript indicates the plaintiff used the word ketosis to describe her condition, this Court believes the plaintiff meant to say ketoacidosis. (Tr. 473.)  According to WebMD, ketoacidosis results in very high levels of blood sugar when an individual does not take enough insulin.

25

When questioned about her diabetic claw hand syndrome, the plaintiff testified that it remains a problem. (Tr. 477.) She testified that she would "love to go back to work," even if it were volunteer work. She tried typing, but she made a lot of errors, and it caused her hands to cramp and ache. *Id.* She reported that holding a telephone or gripping anything for any amount of time caused sharp pains. *Id.* She experienced problems with her hands and fingers "freezing," and being unable to move them or release objects. (Tr. 478.)

The plaintiff testified that if she sat for a long time, her knees stiffened to the extent that it was hard to stand up and walk, and that it was hard to get up and walk first thing in the morning. *Id.* She experienced fatigue during the day, and some days took naps for thirty minutes to an hour. (Tr. 479.) She described her current condition as "tired and sluggish," with muscle ache all over, in her arms, back, and legs. *Id.* The plaintiff described her pain as a "cramping, muscle strain." *Id.*

The plaintiff testified about her diabetic neuropathy, relating that the tops of her toes and feet, as well as part of her leg and the skin on her arms, were numb. (Tr. 481.) The plaintiff listed her current medications, including several heart-related medications, insulin, and Synthroid for her thyroid. (Tr. 483.)

The plaintiff further testified about her activities of daily living, stating that her husband does most of the driving. *Id.* The plaintiff stated that she only occasionally drives very short distances from the home due to her difficulty gripping the steering wheel. (Tr. 484.) The plaintiff testified that she could no longer vacuum the floor, clean windows, had difficulty cooking meals at home, required the assistance of her husband to do the shopping, and could no longer garden, a hobby that she formerly enjoyed. (Tr. 484-85.)

26

In 2002 and 2003, the plaintiff worked at a local elementary school, greeting the children, preparing their snacks, and using a walkie-talkie to coordinate parent pick ups. (Tr. 485.) She worked three hours per day five days a week, but her days were eventually reduced to three or four days per week, with the plaintiff sometimes only working two hours per day. (Tr. 486.) She had to quit working because of her heart problem and the exhaustion and ensuing irritability it caused.

The plaintiff testified that she was 5'2" tall and weighed about 186 pounds. (Tr. 486-87.) The plaintiff's weight had increased from 155 pounds to her current weight over the past two years. (Tr. 487.) The plaintiff never saw a psychiatrist, and was offended by her doctor's suggestion that she do so. (Tr. 489.) She testified that she briefly took antidepressants but experienced nightmares and could not continue taking them. *Id.*

The plaintiff testified that she was last able to vacuum or do yard work in 1992. (Tr. 490.) In an attempt to exercise, the plaintiff was at one point able to walk for "about an hour" in the mall, but she testified that she was not able to do that at the time of her hearing. *Id.* For the past year, she had been able to walk for about twenty or thirty minutes on a treadmill at a "normal" pace. (Tr. 493.)

The plaintiff testified that she is able to dress herself as long as she wears simple clothes with no buttons. *Id.* She estimated that her overall condition at the time of her hearing was about the same as it was at the same time the previous year, and a little better than it was ten years ago. (Tr. 493-94.) The plaintiff stated that she became insulin dependent in 1992, and that she was first diagnosed with diabetes in 1985. (Tr. 495.) The plaintiff had an insulin pump implanted a year prior to the time of her hearing. *Id.*

The ALJ asked the plaintiff why she waited five years after her alleged date of onset to file an application for benefits. *Id.* "I was trying to see if I would get better," the plaintiff explained. (Tr. 497.) After five years, the plaintiff decided she was not getting better and could not find a job.

Dr. Gordon Doss, VE, testified that the plaintiff's past work included cashiering at the light, semi-skilled level; stock clerk performed at the light, unskilled level; prep cook at the medium and semi-skilled level; dishwasher at the medium and unskilled level; childcare work at the light and unskilled level; and work as director of a daycare at the light, skilled level. (Tr. 497-99.)

The ALJ asked the VE to consider a forty-four year old person with a high school education and the plaintiff's background and experience. (Tr. 499.) The ALJ specified that the VE should consider light work with a stand/walk capability of six hours, limited pushing/pulling in the upper extremities, and moderate limitations with regard to gripping, handling, and fine fingering. *Id.* The hypothetical person could not climb ladders or scaffolds, could not crawl, but could occasionally climb stairs, ramps, balance, stoop, bend, kneel, or crouch, with an additional limitation of avoiding hazardous machinery and unprotected heights. *Id.* The VE opined that a person with these limitations could manage a daycare facility, assuming cashiering responsibilities would not be on the same level as would be expected at Wal-Mart. *Id.*

The ALJ's next asked the VE to consider a moderate limitation on concentration, persistence, and pace in deference to pain and discomfort. *Id.* The VE opined that moderate limitations would not have a significant effect on the person's ability to do work. (Tr. 500.) The ALJ then inquired about jobs available under this hypothetical at a low level of semi-skilled work at a Specific Vocational Preparation ("SVP") of 3 and below, and unskilled work. *Id.* The VE testified that these jobs would include security guard at the light, unskilled level, telemarketer, telephone salesperson,

Case 3:05-cv-00344   Document 13   Filed 02/03/09   Page 28 of 44 PageID #: 92

or an appointment clerk. *Id.* The person could also work as a cashier at the light and unskilled level at a counter or a window, or as a receptionist. (Tr. 501.)

When asked to assume increased difficulties in handling that would preclude cashier work, and the RFC and limitations provided by Dr. Hancock, the VE opined that the security guard job, the telemarketing and receptionist jobs would remain available, and that the person could also work as a teacher's aide. (Tr. 501-02.) The ALJ then asked the VE to consider the RFC provided by Dr. McDonald on June 22, 2003. (Tr. 570-73.) The VE agreed that Dr. McDonald's assessment would not permit a full day's work (Tr. 502) and that the RFC provided by Dr. John described less than full-time work.[10] (Tr. 503.) The VE referred to the ALJ's notes regarding the assessment done by Dr. Tetzeli, and noted that it would not allow for a forty-hour work week.[11] *Id.* When the ALJ asked the VE to consider whether there would be work for a person with these limitations if the plaintiff were given full credibility, the VE responded that the limiting factor would be pain. (Tr. 504.) The VE opined that with a mild to moderate level of pain, jobs would be available, but at the moderately severe or severe level on a persistent basis, pain would be disabling due to the effect on attention and concentration. *Id.*

### III.  THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on June 24, 2004. (Tr. 444-54.) Based on the record, the ALJ made the following findings. (Tr. 453-54.)

---

[10] The ALJ referred to "the evaluation of Dr. Johns [sic]" as Exhibit 7F. However, Exhibit 7F is Dr. Tetzeli's assessment. (Tr. 206-10.) It does not appear that Dr. John completed a medical source statement.

[11] The transcript spells Dr. Tetzeli's name phonetically as "Dr. Selli." (Tr. 503.)

29

1. The claimant met the disability insured status requirements of the Act on January 1, 1992, her alleged disability onset date, and continued to meet them through June 30, 1994.

2. The claimant has not engaged in substantial gainful activity since January 1, 1992.

3. From January 1, 1992 to June 30, 1994, the claimant's "severe" impairments were diabetes mellitus with associated peripheral neuropathy and neuropathic arthropathy and the residuals of a bilateral carpal tunnel release, but that, during that period, she did not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. As discussed above, the claimant's testimony could not be found credible.

5. From January 1, 1992 to June 30, 1994, the claimant could have performed the residual functional capacity described above. 20 CFR §404.1545.

6. From January 1, 1992, to June 30, 1994, the claimant could not have performed her past relevant work as school cafeteria worker, a stocker, a dishwasher, a day care center director, a cashier, a day care teacher, a fast food worker, or a cafeteria cashier. 20 CFR §404.1565.

7. With a high school education, the claimant was 42 to 44 years old, which is defined as a younger individual, from January 1, 1992 to June 30, 1994. 20 CFR §§404.1463 and 404.1464.

8. From January 1, 1992 to June 30, 1994, the claimant had work skills that transferred to other skilled or semi-skilled work activities. 20 CFR §404.1568.

9. From January 1, 1992 to June 30, 1994, considering her residual functional capacity and vocational factors and using Rule 202.22 as a framework for decisionmaking, a significant number of jobs that the claimant could have performed existed in the regional economy. Examples and numbers of such jobs are given above. Table 2 of Appendix 2 to Subpart P of Regulations No. 4; 20 CFR §404.1569.

10. From January 1, 1992, to June 20, 1994, the claimant was not under a "disability," as defined in the Social Security Act. 20 CFR §404.1520(f).

# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C.A. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases). The Commissioner's decision must be affirmed if it is supported by substantial evidence, even if the evidence could also support another conclusion. *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*). A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C.A. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot*

31

*v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).  The original burden of establishing disability is on

the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory

diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d).

First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she

seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b) and 416.920(b)).  A plaintiff who is

performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical

condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir.

1990).

Second, the plaintiff must show that she suffers from a "severe impairment."  A "severe

impairment" is one which "significantly limits . . . physical or mental ability to do basic work

activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c) and 416.920(c)).  Basic work activities are "the

abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing,

pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking;

[u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding

appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a

routine work setting." 20 C.F.R. § 404.1521(b).  The Commissioner is required to consider the

combined effects of impairments that individually are not severe but cumulatively may constitute a

severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a

severe impairment that has lasted or is expected to last for a continuous period of at least twelve

months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled

without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R.

32

§§ 404.1520(d) and 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines "grid" as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the plaintiff can perform, she

33

is not disabled.[12]  *Id.  See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4).  *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B.  The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's case at step five of the five-step process. (Tr. 454.)  At step one, the ALJ found that the plaintiff successfully demonstrated that she had not engaged in substantial gainful activity since the alleged onset date of disability of January 1, 1992. (Tr. 453.)  At step two, the ALJ found that the plaintiff suffered from the severe impairments of diabetes mellitus with associated peripheral neuropathy and neuropathic arthropathy and the residuals of a bilateral carpal tunnel release. (Tr. 453-54.)  At step three, the ALJ determined that the plaintiff's impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.  *Id.*  At step four, the ALJ found that the plaintiff had the residual functional capacity to perform a light level of work with a limited ability to push or pull with the upper extremities, a limited ability to grip and handle objects, ability to perform only occasional postural activities (and never crawling or climbing), and with a moderate limitation on sustaining

---

[12] This latter factor is considered regardless of whether such work exists in the immediate area in which the plaintiff lives or whether a specific job vacancy exists or whether the plaintiff would be hired if she applied.  *Ragan v. Finch*, 435 F.2d 239, 241 (6th Cir. 1970).

concentration, persistence, or pace due to pain. (Tr. 453.) The ALJ found that the plaintiff could not perform her past relevant work, but that there were a significant number of jobs that existed in the regional economy that the plaintiff could perform. (Tr. 454.)

### C. The Plaintiff's Assertions of Error

The plaintiff contends that the ALJ erred in assessing the opinions of two of the plaintiff's treating physicians and a consulting physician. (Docket Entry No. 6, at 13-21.) The plaintiff also contends that the ALJ erred in evaluating the credibility of her testimony. *Id.* at 21-27.

**The ALJ erred in weighing the medical evidence and opinions of the plaintiff's treating physicians and in accepting the opinion of a consultative physician.**

#### 1. Dr. Gary McDonald

Dr. McDonald first treated the plaintiff on September 23, 1996, when she was hospitalized following her hiatus since 1993, from receiving any professional medical care. (Tr. 164.) Dr. McDonald treated the plaintiff for her immediate diabetic crisis and thereafter became her general physician, seeing her on a fairly regular basis thereafter through at least September 2003. (Tr. 621-30.) Given the regularity with which Dr. McDonald saw the plaintiff, he is classified as a treating source under 20 C.F.R. § 404.1502.[13] The plaintiff argues that even though her treating relationship

---

[13] A treating source, defined by 20 C.F.R. § 404.1502, is

. . . your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s).

35

with Dr. McDonald did not begin until 1996, roughly two years after the expiration of her insured status, the ALJ erred in giving Dr. McDonald's 1998 medical assessment very little weight. (Docket Entry No. 6, at 13.)

Generally, an ALJ is required to give greater deference to the medical opinion of a treating physician as compared to the medical opinion of non-treating physician. This is commonly known as the treating physician rule.[14] *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir.2004). Since treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone," a significant amount of weight is accorded to their opinions. 20 C.F.R. § 416.927(d)(2). An ALJ must provide "good reasons" for discounting a treating physician's opinion, i.e., reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2)).

The ALJ discounted Dr. McDonald's assessment due to the lapse in time between both the plaintiff's date last insured and the plaintiff's initial visit to Dr. McDonald, and between the plaintiff's date last insured and Dr. McDonald's assessment. (Tr. 452.) The ALJ stated:

> Dr. McDonald did not start seeing the claimant . . . until September 1996, over two years after the date that she was last insured. Also, Dr. McDonald is <u>not</u> a specialist, and he reviewed only his own medical records. Thus, his July 1998 assessment, which was *four years* after the claimant was last insured for disability insurance benefits, also receives very little weight.

*Id.* (emphasis in original)

---

[14] The defendant does not contest Dr. McDonald's status as a treating physician. *See* Docket Entry No. 9, at 8.

In *Begley v. Mathews*, 544 F.2d 1345, 1354 (6th Cir. 1976) (quoting Wigmore, Evidence §§ 225, 233 (3d ed. 1940)), the Court noted that "[m]edical evidence of a subsequent condition of health, reasonably proximate to a preceding time, may be used to establish the existence of the same condition at the preceding time." The rationale from *Begley* was further elucidated in *Anderson v. Comm'r of Soc. Sec.*, 440 F. Supp.2d 696, 699-700 (E.D. Mich. 2006), in which the District Court explained that "[m]edical evidence that postdates the insured status date may be, and ought to be, considered, insofar as it bears on the claimant's condition prior to the expiration of insured status." *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th 1988) (citing *Martonik v. Heckler*, 773 F.2d 236, 240 (8th Cir. 1985)); *Holcomb v. Comm'r of Soc. Sec.*, 2008 WL 3889611 at *12 (W.D. Mich. 2008).

Dr. McDonald explained that before diagnosing the plaintiff with fibromyalgia, he reviewed her medical history and records. (Tr. 234.) Dr. McDonald opined that the plaintiff had the same or similar fibromyalgic symptoms since 1991. *Id.* His assessment also detailed the severe physical impairments associated with the plaintiff's hands. *Id.* Given that the information in Dr. McDonald's assessment addressed the plaintiff's period of disability, the lack of weight given by the ALJ contravenes *Begley's* well-established precedent that medical evidence postdating the date last insured should be considered if it is being used to establish the plaintiff's medical condition preceding the date last insured. 544 F.2d at 1354. Additionally, the ALJ gave the most weight to Dr. Hancock's November 2003 assessment, even though Dr. Hancock, an orthopedist, never examined the plaintiff and completed his assessment nine years after the plaintiff's date last insured. (Tr. 680.)

The ALJ further noted that Dr. McDonald was "not a specialist." (Tr. 452.) Under the circumstances of this case, the fact that Dr. McDonald is an internist (Tr. 450) does not necessarily affect the weight to be given to his opinion. Dr. McDonald became the plaintiff's treating physician in 1996, and reviewed the plaintiff's medical history from 1991 to 1998, before completing his 1998 assessment. *Id.* While 20 C.F.R. § 404.1527(d)(5) grants "more weight to the opinion of a specialist

37

about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist," an internist is equally qualified to complete a medical assessment of ability to do work as is an orthopedist.

This Court also disagrees with the ALJ's conclusion that Dr. McDonald "reviewed only his own medical records" in compiling his assessment. (Tr. 452.) Dr. McDonald clearly stated in the notes section of his assessment that:

> Based upon the history I took of [the plaintiff] and my review of her medical records, she has had these same or similar symptoms since 1991 when she was seen by Dr. Porter Meadors. Her hands have a claw like deformity and are quite stiff as a result of diabetic hand syndrome. . . . I understand that she has had very limited movement with her hands as a result of the diabetic hand syndrome since she saw Dr. Cynthia Susskind in 1992."

(Tr. 234.) The record does not contain evidence supporting the ALJ's conclusion that Dr. McDonald only reviewed his own medical reports.

The ALJ erred by failing to provide "good reasons" for giving Dr. McDonald's assessment such "little weight." (Tr. 452.) The record does not contain substantial evidence to discount Dr. McDonald's assessment of the plaintiff.

### 2. Dr. John Tetzeli

Dr. Tetzeli examined the plaintiff for the first time on May 20, 1992. (Tr. 135.) The plaintiff complained of "diffuse pain" throughout her hands, arms, and lower extremities. (Tr. 135.) The plaintiff returned to Dr. Tetzeli for follow-up examinations on July 17, 1992, and August 25, 1992.[15] (Tr. 132-34.) Given this "ongoing treatment relationship" between Dr. Tetzeli and the plaintiff, Dr. Tetzeli would be classified as a treating source. 20 C.F.R. § 404.1502. After the plaintiff's visits

---

[15] The plaintiff contends that Dr. Tetzeli saw her four times in 1992, including June 17, 1992. Docket Entry No. 6, at 17. The defendant contends that the plaintiff only saw Dr. Tetzeli three times in 1992. Docket Entry No. 9, at 10. Although the date of the visit is obscured, it appears that the plaintiff may, in fact, have seen Dr. Tetzeli on June 17, 1992. (Tr. 134.)

in 1992, Dr. Tetzeli did not evaluate her until May 25, 1998, when Dr. Tetzeli completed an ability to do work assessment.(Tr. 206.)  Addressing the entirety of Dr. Tetzeli's assessment, the ALJ found,

> Dr. Tetzeli's May 1998 assessment receives very little weight since he saw the claimant only three times in the span of four months in 1992, which was *six years* before the assessment. Also, he only reviewed his own medical records. Further, when he last saw her, Dr. Tetzeli told the claimant to try to *increase* her activity level.

(Tr. 452.) (emphasis in original)

Dr. Tetzeli's assessment evaluated the plaintiff's work limitations based upon his 1992 medical records of the plaintiff.  Dr. Tetzeli noted that in 1992 the plaintiff suffered from  severe pain, showed symptoms of fibromyalgia, and would not have been able to work. (Tr. 210.) The ALJ took issue with the six year lapse in time between the plaintiff's last visit to Dr. Tetzeli in 1992 and Dr. Tetzeli's assessment in 1998.  Yet, as addressed above, it is permissible to consider medical evidence postdating the date last insured to establish the existence of a medical condition during the alleged period of disability. *See Begley*, 544 F.2d at 1354; *Anderson*, 440 F. Supp.2d at 699-700. Furthermore, the ALJ gave controlling weight to Dr. Hancock's 2003 medical assessment, although it was completed five years after Dr. Tetzeli's assessment and ten years after the plaintiff's date last insured. (Tr. 452.) Dr. Tetzeli was also the only treating physician whose records were available and who examined the plaintiff during her alleged period of disability to prepare an ability to do work assessment of the plaintiff.[16]

In support of his conclusion that Dr. Tetzeli's assessment was inconsistent with the 1992 medical reports, the ALJ relied on a notation made on Dr. Tetzeli's August 25, 1992, medical evaluation in which he "encouraged [the plaintiff] to slowly increase her activity level." (Tr. 132.) Yet in the same August 25, 1992, notes, Dr. Tetzeli found a decreased range of motion and tenderness in both of the plaintiff's shoulders, and determined that the plaintiff had "diabetic polyneuropathy of a moderate to a severe degree." *Id.* During two preceding visits to Dr. Tetzeli, the plaintiff also

---

[16] There are no medical records from Dr. Daugherty, who, according to the plaintiff's testimony, she saw in 1993, and diagnosed her with fibromyalgia. (Tr. 451.)

complained of diffuse pain that was "accentuated in the hands, arms, and lower extremities," peripheral neuropathy, the inability "to appose the fingers of both hands," and pain that was "persistent" and "lancinating" in her feet and toes. (Tr. 133-35.) The ALJ extracted one statement from a series in Dr. Tetzeli's evaluation while ignoring the remaining medical findings. Cherry picking a statement from a series of medical reports does not sufficiently show the inconsistent nature of those reports.

Therefore, the ALJ failed to provide "good reasons," as required by Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2) and 416.927(d)(2)), for awarding "very little weight" to Dr. Tetzeli's assessment of the plaintiff (Tr. 206-10), and there is not substantial evidence in the record to support his discounting Dr. Tetzeli's assessment.

### 3. Dr. Charles Hancock

On August 20, 2003, the ALJ requested that Dr. Hancock, an orthopedic surgeon, review the entire case file, answer a series of interrogatories, and complete a medical source statement regarding the plaintiff's ability to do work. (Tr. 602-09.) In this first assessment, Dr. Hancock determined that the plaintiff suffered from a severe physical impairment between January 1, 1992, until September 2, 2003, the date Dr. Hancock completed the report. (Tr. 603.) The ALJ made a second request to Dr. Hancock on October 8, 2003, to complete a second medical source statement for the plaintiff, limiting Dr. Hancock's consideration to only those records during the plaintiff's alleged period of disability. (Tr. 678.) The ALJ acknowledged that Dr. Hancock's September assessment "would result in a disability assessment today [of the plaintiff]," but that he only wanted to know the plaintiff's condition on June 30, 1994, the date last insured. *Id.*

The ALJ incorrectly required Dr. Hancock, in completing his second assessment, to examine the plaintiff's medical records only up to the plaintiff's date last insured. (Tr. 678.) As previously addressed, medical evidence that postdates the date last insured should be evaluated if such evidence

40

supports the existence of a medical condition during the alleged period of disability. *See Begley*, 544 F.2d at 1354; *Anderson*, 440 F. Supp.2d at 699-700. Although Dr. Tetzeli and Dr. McDonald completed their assessments in 1998, both treating physicians reviewed the plaintiff's medical reports from the alleged period of disability before rendering their conclusions. Given Dr. Hancock's explanation in his November 2003 assessment that the plaintiff's medical evidence leading up to the date last insured was "insufficient to accurately assess [the plaintiff's] degree of impairment," it would seem necessary to review the assessments of the plaintiff's two treating physicians to attain sufficient clarity. (Tr. 679-80.)

Dr. Hancock further noted that "[i]f one takes considerable liberty and extrapolates 'in reverse', knowing what we now know about her condition, it is not unreasonable to assume that the [plaintiff] had a significant impairment at DLI [date last insured]." (Tr. 680.) It is not clear, however, why Dr. Hancock "extrapolated 'in reverse'" what "we now know about her condition" since those considerations were specifically what the ALJ asked him not to consider in his second assessment. Regardless, the Court finds that the ALJ erred in confining Dr. Hancock to consideration of medical services predating her last insured date. *See Begley*, *supra*; *Anderson*, *supra*. Although the ALJ was correct in that instructing Dr. Hancock not to evaluate the plaintiff's current condition, Dr. Hancock was inappropriately restrained in evaluating her as of June 30, 2004.

The ALJ also determined that Dr. Hancock's "refusal to diagnose fibromyalgia was consistent with the opinion of Dr. Meadors," a rheumatologist.[17] (Tr. 452-53.) In his September 2003 assessment, Dr. Hancock found that a diagnosis of fibromyalgia was "not well made by ACR [American College of Rheumatology] criteria." (Tr. 603) But the record only contains Dr. Meadors's

---

[17] As the ALJ himself noted (Tr. 452), courts have found that a rheumatologist is the relevant specialist for fibromyalgia. *See Sarchet v. Chater*, 78 F. 3d 305, 307 (7th Cir. 1996) ("[f]ibromyalgia is a rheumatic disease and the relevant specialist is a rheumatologist"); *Anderson v. Soc. Sec. Admin.*, No. 3:07-0343, slip op. at *11 (M.D. Tenn. Sept. 10, 2008)(a rheumatologist is the appropriate specialist to "confirm a diagnosis of fibromyalgia"); *Cole v. Comm'r of Soc. Sec.*, 2008 WL 4225775, at *7 (E.D. Mich. Sept. 9, 2008) (a rheumatologist is a specialist in fibromyalgia).

41

November 5, 1992, evaluation of the plaintiff, in which Dr. Meadors does not directly address fibromyalgia. (Tr. 146.) The ALJ incorrectly attributed Dr. Meador's lack of a diagnosis as a "refusal to diagnose." *Id.*

The Court recognizes the significant difficulty in diagnosing fibromyalgia.[18]  Yet, Dr. McDonald opined that the plaintiff had symptoms of fibromyalgia since 1991. (Tr. 234.) Dr. Tetzeli agreed with Dr. McDonald's diagnosis of fibromyalgia, explaining that "[h]er symptoms at the time that I saw her in 1992 were compatible [with] that diagnosis." (Tr. 210.) Although a diagnosis of fibromyalgia does not automatically prove disability on its own, it does support the findings in Dr. Tetzeli's and Dr. McDonald's assessments and the plaintiff's complaints of debilitating pain. *See Vance v. Comm'r of Soc. Sec.*, 260 Fed. Appx. 801, 2008 WL 162942, *4 (6th Cir. Jan. 15, 2008).

The ALJ erred by giving Dr. Hancock's November 2003 assessment far too much weight considering that Dr. Hancock did not properly evaluate the entirety of the plaintiff's medical records

---

[18] The Court of Appeals for the Sixth Circuit has cited the Seventh Circuit with approval in describing the difficulties in diagnosing fibromyalgia:

> [F]ibromyalgia, also known as fibrositis[,] is a common, but elusive and mysterious disease, much like chronic fatigue syndrome, with which it shares a number of features.  Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective.  There are no laboratory tests for the presence or severity of fibromyalgia. The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and-the only symptom that discriminates between it and other diseases of a rheumatic character-multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.

*Huffaker v. Metro. Life Ins. Co.*, 271 Fed. Appx. 493, 2008 WL 822262, *6 n.2 (6th Cir. Mar. 25, 2008) (quoting *Hawkins v. First Union Corp. Long-Term Disability Plan*, 326 F.3d 914, 916 (7th Cir. 2003) (internal quotation marks, alterations, and citations omitted)).

42

as required by *Begley* and *Anderson*. Thus, there is not substantial evidence in the record to support the ALJ's decision based on Dr. Hancock's November 2003 assessment.[19]

## V. CONCLUSION

In sum, the ALJ failed to provide good reasons for rejecting the medical assessments of Dr. McDonald and Dr. Tetzeli, the plaintiff's two treating physicians. Medical evidence postdating the date last insured should be considered if such evidence bears on the plaintiff's condition during the alleged period of disability. Both Dr. McDonald and Dr. Tetzeli reviewed medical evaluations from the alleged period of disability when completing their 1998 medical assessments of the plaintiff. Dr. McDonald and Dr. Tetzeli also diagnosed the plaintiff with symptoms of fibromyalgia dating back to the alleged period of disability. Given the noted difficulty with diagnosing fibromyalgia, it is not surprising that such an impairment could be overlooked until after the date last insured.

While a judicial award of benefits is inappropriate in most cases out of deference to the expertise of the agency and the integrity of the administrative function, such an award is not inappropriate on a record where all the essential factual issues have been resolved, and the claimant's entitlement is adequately established by overwhelming proof of disability or strong proof of disability without significant proof to the contrary. *See Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994). Considering the entirety of the record, including the assessments of disabling limitations and supporting documentation of two treating physicians; the testimony of the vocational expert who determined that the plaintiff's residual functional capacity, based upon the treating physicians' assessments, would not allow the plaintiff to perform a full day's work during the alleged period of disability (Tr. 502-04); and the negligible evidence of ability to engage in work activity on

_____

[19] The plaintiff's remaining assertion, that the ALJ erred in assessing the plaintiff's credibility as "fair to poor" and in evaluating the plaintiff's subjective complaints, is not analyzed separately in light of the finding that the case should be reversed on other grounds.

43

a regular basis during the relevant time frame, this Court concludes that the decision of the ALJ should be reversed, and the plaintiff's claim for disability should be granted.

## VI. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 5) be GRANTED and that the decision of the ALJ should be reversed and benefits awarded.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed. 2d 435 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


Respectfully Submitted,


JULIET GRIFFIN
United States Magistrate Judge

44